No. 25-11843

In the

# United States Court of Appeals
## for the Eleventh Circuit

William Quinn, et al.,
*Plaintiff-Appellants,*

v.

Secretary of State for the State of Georgia,
*Defendant-Appellee.*

On Appeal from the United States District Court for the
Northern District of Georgia, Atlanta Division.
No. 1:24-cv-04364 — Steve C. Jones, Judge

## BRIEF OF DEFENDANT-APPELLEE

Christopher M. Carr
*Attorney General of Georgia*
Bryan Webb
*Deputy Attorney General*
Elizabeth T. Young
*Senior Ass't Attorney General*
Alexandra M. Noonan
*Assistant Attorney General*
Office of the Georgia
 Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 793-5293
anoonan@law.ga.gov
*Counsel for Governor Kemp
and Secretary Raffensperger*

Quinn v. Raffensperger, No. 25-11843

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

I hereby certify that the following persons and entities may have an interest in the outcome of this case:

Akerman LLP, Counsel for former Proposed Intervenor-Defendants

American Civil Liberties Union Foundation, Counsel for former Proposed Intervenor-Defendants

American Civil Liberties Union Foundation of Georgia, Inc., Counsel for former Proposed Intervenor-Defendants

Baxenberg, Justin, former Counsel for Proposed Intervenor-Defendants

Bishop, Tyler L., Counsel for Proposed Intervenor-Defendants

Black Voters Matter Fund, Proposed Intervenor

Carr, Christopher M., Attorney General, Counsel for Defendant-Appellee

Chaudhuri, Pooja, Counsel for former Proposed Intervenor-Defendants

Common Cause Georgia, former Proposed Intervenor-Defendant

Cross, David , Plaintiff-Appellant

Cusick, John, Counsel for former Proposed Intervenor-Defendants

Davis, Alexander, Counsel for former Proposed Intervenor-Defendants

Dunlap Bennett & Ludwig PLLC, Counsel for Plaintiff-Appellants

Quinn v. Raffensperger, No. 25-11843

Election Watch, Inc., Organization aligned with Plaintiff-Appellants

Flachsbart, William, Counsel for Plaintiff-Appellants

Freidlin, Akiva, Counsel for former Proposed Intervenor-Defendants

Elias Law Group LLP, Counsel for Proposed Intervenor Black Voters Matter Fund

GALEO Latino Community Development Fund, Inc., former Proposed Intervenor-Defendant

Genberg, Jack, Counsel for former Proposed Intervenor-Defendants

Georgia Coalition for the People's Agenda, Inc., former Proposed Intervenor-Defendant

Georgia State Conference of the NAACP, former Proposed Intervenor-Defendant

Greenspoon, Robert P., Counsel for Plaintiff-Appellants

Harding, Todd Andrew, Counsel for Plaintiff-Appellants

Harding Law Firm, LLC, Counsel for Plaintiff- Appellants

Heard, Bradley E., Counsel for former Proposed Intervenor-Defendants

Ho-Sang, Montoya M., former Counsel for Proposed Intervenor-Defendants

Houk, Julie M., Counsel for former Proposed Intervenor-Defendants

Quinn v. Raffensperger, No. 25-11843

Isaacson, Cory, Counsel for former Proposed Intervenor-Defendants

Jones, Hon. Steve C., U.S. District Court Judge

Krevolin & Horst, LLC, Counsel for Proposed Intervenor Black Voters Matter Fund

Lakin, Sophia Lin, Counsel for former Proposed Intervenor-Defendants

Lawyers' Committee for Civil Rights Under Law, Counsel for former Proposed Intervenor-Defendants

League of Women Voters of Georgia, Former Proposed Intervenor-Defendant

Lee, Theresa J., Counsel for former Proposed Intervenor-Defendants

Ludwig, David, Counsel for Plaintiff-Appellants

Magas, Mark A., Counsel for Plaintiff-Appellants

May, Caitlin, Counsel for former Proposed Intervenor-Defendants

McGowan, Charlene S., General Counsel for Defendant-Appellee

Mocine-McQueen, Marcos, Counsel for Proposed Intervenor Black Voters Matter Fund

NAACP Legal Defense & Educational Fund, Inc., Counsel for former Proposed Intervenor-Defendants

Naifeh, Stuart, Counsel for former Proposed Intervenor-Defendants

Nkwonta, Uzoma N., Counsel for Proposed Intervenor Black Voters Matter Fund

Quinn v. Raffensperger, No. 25-11843

Noonan, Alexandra M., Assistant Attorney General, Counsel for Defendant-Appellee

O'Donnell, Courtney, Counsel for former Proposed Intervenor-Defendants

O'Donnell, Renata M., prior Counsel for Proposed Intervenor-Defendant Black Voters Matter Fund (withdrawn)

Pinchak, James J., Counsel for Proposed Intervenor Black Voters Matter Fund

Putbrese, Cortland C., Counsel for Plaintiff-Appellants

Quinn, William T., Plaintiff-Appellant

Raffensperger, Brad, in his official capacity as Georgia Secretary of State, Defendant-Appellee

Rohani, I. Sara, Counsel for former Proposed Intervenor-Defendants

Rosenberg, Ezra D., Counsel for former Proposed Intervenor-Defendants

Shapiro, Avner M., Counsel for former Proposed Intervenor-Defendants

Smith-Carrington, Avatara A., Counsel for former Proposed Intervenor-Defendants

Southern Poverty Law Center, Counsel for former Proposed Intervenor-Defendants

Sparks, Adam M., Counsel for Proposed Intervenor Black Voters Matter Fund

Spencer, R. Gary, Counsel for former Proposed Intervenor-Defendants

C-4 of 5

Quinn v. Raffensperger, No. 25-11843

Szilagyi, Heather, Counsel for former Proposed Intervenor-Defendants

Washington, Anré D., Counsel for Proposed Intervenor Black Voters Matter Fund

Webb, Bryan K., Deputy Attorney General, Counsel for Defendant-Appellee

Weber, Gerald R., Law Office of Gerald R. Weber, Attorney for former Proposed Intervenor-Defendants

Winichakul, Pichaya Poy, Southern Poverty Law Center, Counsel for former Proposed Intervenor-Defendants

Young, Elizabeth T., Senior Assistant Attorney General, Counsel for Defendant-Appellee.


/s/ *Alexandra Noonan*
Alexandra Noonan

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-Appellee does not request oral argument in this case. The facts and legal arguments are adequately presented in the briefs, and the decisional process would not be significantly aided by oral argument.

# TABLE OF CONTENTS

**Page**

Statement Regarding Oral Argument.................................................. i

Table of Authorities ..................................................................... iii

Statement of Issues .................................................................... 1

Introduction ............................................................................. 2

Statement of the Case.................................................................. 6

    A.  Statutory Background................................................... 7

        1.  The National Voting Rights Act....................................... 7

        2.  Georgia's list maintenance procedures and O.C.G.A. § 21-2-233................................................................ 9

    B.  Factual Background ..................................................... 11

    C.  Proceedings Below....................................................... 14

    D.  Standard of Review ...................................................... 17

Summary of Argument .................................................................. 17

Argument ................................................................................. 21

    I.  Plaintiffs lack Article III standing because they have not suffered an injury in fact. .............................................. 21

        A.  Plaintiffs' alleged "lost confidence" is too abstract to constitute a cognizable injury. ..................................... 22

        B.  Lost confidence in the electoral process amounts to a generalized grievance.................................................. 26

        C.  Plaintiffs' alleged injury is too speculative to satisfy Article III. ................................................................ 35

Conclusion................................................................................ 40

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. C.R. Union v. Martinez-Rivera,*
166 F. Supp. 3d 779 (W.D. Tex. 2015) ...............................24, 25

*Bellitto v. Snipes,*
935 F.3d 1192 (11th Cir. 2019) ...........................................7, 8, 9

*Carney v. Adams,*
592 U.S. 53 (2020) ................................................................. 21

*Church v. City of Huntsville,*
30 F.3d 1332 (11th Cir. 1994) ................................................ 38

*City of S. Miami v. Governor,*
65 F.4th 631 (11th Cir. 2023)..........................................5, 20, 37

*\*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ............................................4, 20, 35, 36, 37

*Crawford v. Marion County Election Board,*
553 U.S. 181 (2008) ...........................................................39, 40

*Day v. Taylor,*
400 F.3d 1272 (11th Cir. 2005) .............................................. 13

*Fed. Election Comm'n v. Akins,*
524 U.S. 11 (1998) ................................................................. 23

*Food & Drug Admin. v. All. for Hippocratic Med.,*
602 U.S. 367 (2024) .......................................................26, 27, 31

*Freeman v. First Union Nat.,*
329 F.3d 1231 (11th Cir. 2003) .............................................. 17

*Gardner v. Mutz,*
962 F.3d 1329 (11th Cir. 2020) .......................................... 4, 23

iii

*Green v. Bell*,
No. 3:21-CV-00493-RJC-DCK, 2023 WL 2572210
(W.D.N.C. Mar. 20, 2023)...................................................... 24

*Hein v. Freedom From Religion Found., Inc.*,
551 U.S. 587 (2007) ....................................................... 23

*Iowa Voter All. v. Black Hawk Cnty.*,
515 F. Supp. 3d 980 (E.D. Iowa 2021) ..................................... 25

*Jacobson v. Fla. Sec'y of State*,
974 F.3d 1236 (11th Cir. 2020) .....................................20, 21, 35

*Jud. Watch, Inc. v. Read*,
No. 6:24-CV-01783-MC, 2025 WL 2242876
(D. Or. Aug. 5, 2025)....................................................... 25

*Jud. Watch v. Ill. State Bd. of Elections*,
No. 24-cv-1867, 2024 WL 4721512 (N.D. Ill. Oct. 28, 2024)..... 25

*Judicial Watch, Inc. v. Griswold*,
554 F. Supp. 3d 1091 (D. Colo. 2021)..................................24, 39

*Judicial Watch, Inc. v. King*,
993 F. Supp. 2d 919 (S.D. Ind. 2012) ..................................24, 40

*Ladies Mem'l Ass'n, Inc. v. City of Pensacola*,
34 F.4th 988 (11th Cir. 2022)............................................17, 23

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .............................................20, 21, 31, 34

*Mancini v. Delaware County*,
No. 24-cv-2425, 2024 WL 4680034 (E.D. Pa. Nov. 5, 2024) ..... 25

*Md. Election Integrity, LLC v. Md. State Bd. of Elections*,
No. 24 C 672, 2024 WL 2053773 (D. Md. May 8, 2024)............ 25

iv

*Mussi v. Fontes*,
  No. 24-cv-01310, 2024 WL 4988589
  (D. Ariz. Dec. 5, 2024) ........................................................25, 36

*Nat'l Coal. on Black Civic Participation v. Wohl*,
  512 F. Supp. 3d 500 (S.D.N.Y. 2021) ........................................ 24

*Republican Nat'l Comm. v. Benson*,
  754 F. Supp. 3d 773 (W.D. Mich. 2024) .................................... 25

*Republican Nat'l Committee v. Aguilar*,
  No. 2:24-CV-00518-CDS-MDC, 2024 WL 4529358
  (D. Nev. Oct. 18, 2024) ........................................................25, 33

*\*Sierra Club v. Morton*,
  405 U.S. 727 (1972) .............................................................20, 32

*\*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ...............................................18, 21, 22, 29

*Thielman v. Fagan*,
  No. 3:22-CV-01516-SB, 2023 WL 4267434
  (D. Or. June 29, 2023) ............................................................ 25

*Thielman v. Griffin-Valade*,
  No. 23-35452, 2023 WL 8594389 (9th Cir. Dec. 12, 2023) ....... 25

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) .............................................................22, 24

*Trichell v. Midland Credit Mgmt., Inc.*,
  964 F.3d 990 (11th Cir. 2020) ..............................................18, 21

*\*Valley Forge Christian Coll. v. Americans United for
  Separation of Church & State, Inc.*,
  454 U.S. 464 (1982) .........................................................19, 23, 26

*Walters v. Fast AC, LLC*,
  60 F.4th 642 (11th Cir. 2023).................................................. 32

v

*Wisconsin Voter All. v. Millis*,
720 F. Supp. 3d 703 (E.D. Wis. 2024) ...................................... 24

*\*Wood v. Raffensperger*,
981 F.3d 1307 (11th Cir. 2020) .. 2, 5, 6, 18, 19, 27, 28, 29, 30, 33

*Wooden v. Bd. of Regents of Univ. Sys. of Ga.*,
247 F.3d 1262 (11th Cir. 2001) ............................................. 5, 38

## Constitutional Provisions

U.S. Const. Art. III, § 2, cl. 1 .......................................... 21

## Statutes

52 U.S.C. § 20501(b) ...................................................... 7

52 U.S.C. § 20507(a)(4) ...............................................1, 6, 8

52 U.S.C. § 20507(c)(1) .................................................... 8

O.C.G.A. § 21-2-210 ........................................................ 9

O.C.G.A. § 21-2-230 ....................................................11, 13

O.C.G.A. § 21-2-231(a) .................................................... 10

O.C.G.A. § 21-2-233 .....................................................1, 6, 9

O.C.G.A. § 21-2-233(a) .................................................... 10

O.C.G.A. § 21-2-233(c) ..................................................10, 12

O.C.G.A. § 21-2-234(a)(2).................................................. 10

O.C.G.A. § 21-2-235(a) ..................................................... 9

**Other Authorities**

*What does PS Form 3575 (Mail Forwarding Change of
    Address Order) Look Like?*, USPS,
    https://faq.usps.com/s/article/What-does-PS-Form-3575-
    Mail-Forwarding-Change-of-Address-Order-Look-Like......12, 13

*What is ERIC?*, https://ericstates.org/about................................. 10

## STATEMENT OF ISSUES

1.    Plaintiffs challenged Defendant-Appellee's voter list maintenance procedures and the adequacy of O.C.G.A. § 21-2-233 under the National Voting Rights Act, 52 U.S.C. § 20507(a)(4)(B). The only injury they point to is a generalized "lost confidence" in the electoral process. Is that alleged injury sufficient for Article III standing?

## INTRODUCTION

Plaintiffs contend that "Georgia's failure to maintain accurate voter lists" has caused "Plaintiffs' confidence in the electoral process … to be undermined." Doc. 45 at 18. That is not an injury sufficient to satisfy Article III standing requirements, and it is not a close question. Indeed, in *Wood v. Raffensperger*, this Court already explained that a generalized grievance about the administration of election laws, "no matter how sincere," cannot be a particularized injury to establish standing for purposes of Article III. 981 F.3d 1307, 1314 (11th Cir. 2020). All Georgians—and indeed all Americans—share an interest in the proper administration of federal elections. *Id.* There must be more for a plaintiff to maintain a suit challenging an electoral procedure in federal court.

Plaintiffs nevertheless urge this Court to permit them to relitigate *Wood*, this time with a repackaged theory of harm: their subjective lost confidence in the integrity of Georgia's elections. If Plaintiffs were correct, not only would *Wood* be a dead letter, but any citizen could challenge *any* voting law at *any* time just by asserting that they "lost confidence" in election integrity. Plaintiffs cannot point to a single case in this Court or any other court of appeals recognizing "lost confidence in the electoral

2

process" as an injury-in-fact, and for obvious good reason. The Court need say no more to reject their appeal.

Even if *Wood* (and the barest common sense) did not resolve the issue, there is nothing concrete or particularized about Plaintiffs' alleged injuries. Plaintiffs challenge the Secretary's maintenance procedures for Georgia's active voter list. Doc. 45 at 16–20. Plaintiffs claim to have conducted an analysis based on information supplied by United States Postal Service's change of address database, which they contend has identified hundreds of "anomalies" in Georgia's voter list. *Id.* at 3, 8–9. In a letter Plaintiffs sent the Secretary, Plaintiffs claim to have identified "voters who permanently moved outside of the jurisdiction in which they are currently registered." Doc 45-1 at 1. Plaintiffs allege that the Secretary's decision not to respond to this letter and conduct Plaintiffs' preferred maintenance procedures has injured their confidence in the electoral process. But Plaintiffs cannot explain what about the presence of these individuals on the active voter list or Secretary's conduct injures them, much less in any way distinct from a supposed injury to the public at large.

No court of appeals, much less the Supreme Court, has recognized lost confidence in the electoral process as a concrete injury sufficient to satisfy Article III. In fact, the Supreme Court

3

and this Court have "consistently held that purely psychic injuries arising from disagreement with government action" are insufficient for standing. *Gardner v. Mutz*, 962 F.3d 1329, 1341 (11th Cir. 2020). Having abandoned their argument that they are injured by the potential dilution of their votes, Br. at 9, Plaintiffs cannot articulate any non-psychic injury that could satisfy Article III's concreteness requirement.

Plaintiffs claim that their "personal experiences" with Defendant-Appellee, the Secretary of State, and their "unique" analysis of public data differentiate them from other Georgia voters, Br. at 13–15, but that is patently untrue. The "personal experience" to which they refer is that the Secretary did not respond to their letter. By that logic, anyone who submits a complaint to the Secretary and does not receive a response has suffered a particularized injury. Even more egregious is Plaintiffs' claim that the Secretary's *defense of this litigation* constitutes an Article III injury. Plaintiffs' inclusion of the Secretary's "mo[tion] to dismiss," Br. at 14, as an injurious interaction just clarifies the point: Plaintiffs are nowhere *close* to standing.

Plaintiffs' theory of injury is also too speculative. It relies on a "chain of possibilities" resting on "speculation about the decisions of independent actors." *Clapper v. Amnesty Int'l USA*, 568 U.S.

4

398, 414 (2013). Here, Plaintiffs lost confidence is based on their speculation that (1) there are ineligible voters on the active voter list; (2) those individuals will not be removed through the Secretary's ongoing maintenance procedures; (3) those ineligible individuals will engage in voter fraud; and (4) that no safeguards in place will prevent them from doing so. An alleged fear is far too speculative where it relies on such an attenuated chain of possibilities. *See, e.g.*, *City of S. Miami v. Governor*, 65 F.4th 631, 637 (11th Cir. 2023). Plaintiffs' insistence that their personal "experiences" with the Secretary have caused them a present injury is also inconsistent with their request for prospective injunctive relief. *See* Doc. 45 at 21. The amended complaint pleads no facts suggesting Plaintiffs are at imminent risk of experiencing similar treatment in the future. *See Wooden v. Bd. of Regents of Univ. Sys. of Ga.*, 247 F.3d 1262, 1284 (11th Cir. 2001).

Plaintiffs are clearly passionate in their desire to confirm the integrity of Georgia's voter lists and electoral process. But however sincere, passion does not elevate Plaintiffs above the broader population of voters that have as much right as Plaintiffs to a fair and accurate electoral process. Plaintiffs' choice to do their own research and write the Secretary about it does not mean that Plaintiffs are anything more than "concerned bystander[s]."

5

*Wood*, 981 F.3d at 1316. It does not endow them with an Article III injury. Plaintiffs' brief makes clear that they would prefer that the Secretary exercise his discretion in conducting voter roll maintenance in a different way. But disagreement with official policy does not an Article III injury make.

This Court should affirm.

## STATEMENT OF THE CASE

Plaintiffs are two individual Georgia voters who assert two claims under the National Voting Rights Act against the Secretary. Doc. 45 at 3, 16–20. Plaintiffs allege that the Secretary violated 52 U.S.C. § 20507(a)(4)(B) in conducting maintenance on Georgia's active voter list. *See id.* at 16–18. Plaintiffs further allege that O.C.G.A. § 21-2-233, which governs list maintenance procedures for Georgia's official voter list, violates 52 U.S.C. § 20507(a)(4)(B). *See id.* at 18–20. Plaintiffs seek declaratory judgments that the Secretary's current list maintenance procedures and O.C.G.A. § 21-2-233 violate 52 U.S.C. § 20507(a)(4)(B) and seek prospective injunctive relief requiring the Secretary to investigate certain individuals on Georgia's active voter list. *See id.* at 21. The Secretary moved to dismiss, arguing that Plaintiffs lacked standing to bring their claims and failed to state a claim on which relief can be granted. Doc. 48. The district

court granted the Secretary's motion to dismiss for lack of standing, holding that Plaintiffs had not asserted either a particularized or imminent injury. Doc. 66 at 5–10.

## A. Statutory Background

### 1. The National Voting Rights Act

Congress enacted the NVRA with two sets of goals in mind. The first set of goals was "to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office" and "to make it possible for Federal, State, and local governments to implement [the NVRA] in a manner that enhances the participation of eligible citizens as voters in elections for Federal office." 52 U.S.C. § 20501(b)(1)–(2). In recognition of the fact that "easing registration barriers could threaten the integrity of our elections," *Bellitto v. Snipes*, 935 F.3d 1192, 1198 (11th Cir. 2019), the NVRA also articulated its second set of goals: "to protect the integrity of the electoral process" and "to ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(3)–(4). As this Court observed, Congress sought to balance the competing interests of "easing barriers to registration and voting, while at the same time protecting electoral integrity and the maintenance of accurate voter rolls." *Bellitto*, 935 F.3d at 1198.

7

Section 8 of the NVRA requires the states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of [] the death of the registrant; or [] a change in the residence of the registrant." 52 U.S.C. § 20507(a)(4). The NVRA does not define what constitutes a "reasonable effort." *Bellitto*, 935 F.3d at 1205.

One method of satisfying Section 8's list maintenance program requirement is to comply with the NVRA's "safe harbor" provision. *See id.* at 1203 (citing 52 U.S.C. § 20507(c)(1)). A state "may meet the requirement of subsection (a)(4) by establishing a program under which" "change-of-address information supplied by [USPS] . . . is used to identify registrants whose addresses may have changed." 52 U.S.C. § 20507(c)(1). If it appears that a registrant may have moved outside the jurisdiction in which the registrant is registered, the registrar sends notice by forwardable mail instructing the registrant to return the card if his or her jurisdiction has not changed. *Id.* § 20507(c)(1), (d)(2)(A). The notice should contain information on how the registrant can continue to be eligible to vote if the registrant has moved out of the jurisdiction in which he or she is registered. *See id.* § 20507(d)(2)(B).

8

The safe harbor provision is "one way in which states 'may' comply with their obligation under the NVRA to identify and remove voters who are no longer eligible due to a change of residence." *Bellitto*, 935 F.3d at 1204 (quoting *A. Philip Randolph Inst. v. Husted*, 838 F.3d 699, 703 n.2 (6th Cir. 2016), *rev'd on other grounds*, 584 U.S. 756 (2018)). States do not have to use the safe harbor process. States "need only use reasonably reliable information" to identify potentially ineligible voters; "[t]he state is not required to exhaust all available methods." *Bellitto*, 935 F.3d at 1205.

### 2. Georgia's list maintenance procedures and O.C.G.A. § 21-2-233

To govern the maintenance processes for Georgia's official voter list, the Georgia General Assembly enacted O.C.G.A. § 21-2-210 *et seq*. The Secretary's obligations are addressed in O.C.G.A. §§ 21-2-233–235. The Secretary is charged with maintaining an "inactive" list of voters, in addition to the official voter list. O.C.G.A. § 21-2-235(a). Relevant here, the Secretary "is authorized to cause at his or her discretion the official list of electors to be compared to the change of address information supplied by the United States Postal Service through its licensees periodically for the purpose of identifying those electors whose

9

addresses have changed." O.C.G.A. § 21-2-233(a). If the change-of-address data suggests that a registrant may have moved outside the jurisdiction in which he or she is registered, the county registrar will send a notice as described above to the registrant; if the registrant does not respond in 30 days, he or she is moved to the inactive list. *Id.* § 21-2-233(c). Registrants who do not respond to the notice and do not vote in two election cycles are purged from the voter rolls. *See id.* § 21-2-235(b).

Georgia conducts other types of list maintenance as well. In the first six months of every odd numbered year, the Secretary is responsible for sending a confirmation notice to all voters on the official voter list "whom there has been no contact during the preceding five calendar years and who were not identified as changing addresses under Code Section 21-2-233[.]" O.C.G.A. § 21-2-234(a)(2). Georgia is also a member of the Electronic Registration Information Center, *see What is ERIC?*, https://ericstates.org/about/ (last visited September 8, 2025), which helps the Secretary identify records of those who may have moved out of state. The Secretary receives monthly lists of those who have been convicted of a felony, *see* O.C.G.A. § 21-2-231(a), died, *id.* § 21-2-231(d), proclaimed not to be citizens during jury duty, *id.* § 21-2-231(a.1), and have had voting rights removed due

10

to mental incompetence, *id.* § 21-2-231(b), and transmits those names to the country registrars, *id.* § 21-2-231(c)–(e).

Finally, under O.C.G.A. § 21-2-230, any elector may challenge the eligibility of any other elector, provided they submit the challenge "in writing and specify distinctly the grounds of such challenge[.]" *Id.* § 21-2-230(a). There is explicitly no limit to the number of registrations that an elector may challenge. *See id.* However, the board of registrars for the relevant county, not the Secretary, would be responsible for investigating that challenge. *See id.* § 21-2-230(b). Information from the national change-of-address database without additional evidence is insufficient cause to sustain the challenge. *See id.*

### B.  Factual Background

Plaintiffs are registered Georgia voters who claim to have been investigating the integrity of Georgia's active voter list. *See* Doc. 45 at 8–9, 13–15. Presumably to avoid the elector challenge procedure provided for under O.C.G.A. § 21-2-230, which does not permit voter challenges based solely on national change-of-address information, Plaintiffs seek to use this litigation to force the Secretary to challenge hundreds or even thousands of active voter registrations based on an "analysis" conducted by Plaintiffs. *See id.* at 1, 21 (requesting "[a]n injunction directing Secretary

Raffensperger to investigate Plaintiff's data by directing all county registrars to send notices under O.C.G.A. § 21-2-233(c) to all identified voters.")

Plaintiffs allege that an unnamed person purchased a "list of voter registrations" from the Secretary on June 30, 2024. *Id.* at 8. Plaintiffs claim to have performed some kind of "analysis" whereby after submitting voter names and address to a "USPS Coding Accuracy Support System" and comparing that with information from the "USPS National Change of Address database," Plaintiffs believe that they could "determine whether [those voters] still resided at their address of registration." *Id.* In fact, as the amended complaint acknowledges, this process—if accurate—at best identifies voters who have filed a request for a mail forward that USPS classifies as permanent. *See id.* The USPS mail forward request form requires individuals who indicate that their move is "temporary" to include a date to discontinue mail forwarding. *See What does PS Form 3575 (Mail Forwarding Change of Address Order) Look Like?*, USPS, https://faq.usps.com/s/article/What-does-PS-Form-3575-Mail-Forwarding-Change-of-Address-Order-Look-Like (last visited

12

September 8, 2025).[1] Otherwise, the applicant selects "permanent." *Id.*

Plaintiffs allege that they submitted the results of this "analysis" and a letter to the Secretary on September 3, 2024. Doc. 45 at 9. Plaintiffs allegedly provided a "flash drive with folders containing spreadsheets" that identified what they believed to be ineligible voters, and claimed that the Secretary's failure to jettison his existing list-maintenance program to instead rely upon these unsolicited spreadsheets somehow violated the NVRA's provision that requires each state to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters." *Id.* at 9–10. Plaintiffs did not acknowledge any of the Secretary's ongoing list maintenance procedures or the existence of their own right to challenge electors under O.C.G.A. § 21-2-230. They conceded that "neither the NVRA nor [Georgia law] specify exactly how often the state must perform maintenance on its voter lists based on change of address information," but nevertheless claimed that the "the

---

[1] Plaintiffs linked to this USPS website in their letter, which is attached as an exhibit to the amended complaint. *See* Doc. 45-1 at 3. Any documents attached to the amended complaint may be considered as part of the pleadings on a motion to dismiss. *See Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005).

fact alone that so many ineligible voters are included on Georgia's voter lists, and have been for such a long time" demonstrated a violation of the NVRA. Doc. 45-1 at 4. Plaintiffs letter further stated that "unless the issues enumerated in this letter are resolved immediately, [Plaintiffs] intend[ed] to file an action" in advance of the November 4, 2024 general election. *Id.* at 1. The Secretary did not respond to this letter.

### C. Proceedings Below

Plaintiffs filed suit on September 26, 2024. Doc. 1. Plaintiffs alleged that, based on their "analysis" revealing "thousands" of active voters who had submitted permanent mail forwards with USPS, the Secretary had failed to make a reasonable effort to remove ineligible voters, in violation of the NVRA and Georgia law. *Id.* at 1.

Plaintiffs alleged that these "discover[ies]" harmed them in two ways: (1) that the existence of these voters on the active voter list created a risk that the power of their own votes would be diluted, and (2) that "Georgia's improperly maintained voter rolls have undermined … Plaintiffs' confidence in the electoral process." *Id.* at 9. Plaintiffs asserted one claim under the NVRA and one under state law. *Id.* at 13–16. Plaintiffs styled the complaint as "expedited," Doc. 1, but did not file a motion for a

temporary restraining order or a preliminary injunction. Plaintiffs also filed a motion styled as an "Emergency Ex Parte Motion to Expedite Proceedings" on September 27, 2024. Doc. 4. The motion requested that the district court order the Secretary to respond to the complaint six days from the motion (despite the Secretary not having been served) and set a hearing date for October 4, 2024. *Id.*

On October 21, 2024, the Secretary moved to dismiss the complaint for lack of standing and for failure to state a claim. Doc. 30. In response to the Secretary's motion to dismiss, Plaintiffs filed an amended complaint on October 25, 2024. Doc. 45. Plaintiffs no longer sought expedited relief or relief under state law.[2] *See id.* The amended complaint also added a second NVRA claim, alleging that Georgia's statute authorizing the Secretary to conduct list maintenance is noncompliant with

---

[2] Plaintiffs allege that the district court "effectively denied" their request for relief prior to the election, Doc. 45 at 12, and that the Secretary's motion to dismiss "delay[ed] their requested relief until after the election," Br. at 3. In fact, that is a problem of Plaintiffs' own making. The district court reminded Plaintiffs early on of the proper procedure for filing a motion for a TRO or preliminary injunction and for requesting expedited treatment of that motion. *See* Doc. 5 at 2–3. Plaintiffs elected to file nothing other than a complaint that Plaintiffs self-designated as "expedited."

15

the NVRA based on a misreading of the Secretary's motion to dismiss. *See id.* at 18–20.

Plaintiffs' theory of harm remained largely the same as in the initial complaint. The amended complaint alleges that Plaintiffs are injured by the risk of vote dilution. Doc. 45 at 11. It further alleges that Plaintiffs' confidence in the electoral system has been injured "as a direct and proximate consequence of Georgia's failure to maintain accurate voter lists." *Id.* at 18. The amended complaint purported to be based on an updated "analysis," using voter registration data allegedly obtained from the Secretary on October 1, 2024. *Id.* at 13. The amended complaint reveals that for two counties, over 65% of the individuals who had filed permanent out-of-state mail forwards had been removed from the active voter list between June and October 2024. *Id.* at 12–14.

The Secretary moved to dismiss the amended complaint, arguing again that Plaintiffs lacked standing to assert their vote dilution and lost confidence claims because these injuries were not particularized and were too speculative. Doc. 48-1 at 8–15. The Secretary also argued that Plaintiffs failed to state a claim on which relief could be granted. *Id.* at 16–25.

16

The district court granted the Secretary's motion to dismiss for lack of jurisdiction. Doc. 66. The district court held that Plaintiffs had failed to show that their alleged vote dilution and lost confidence injuries were particularized to them and determined that both injuries were "generalized grievance[s]." *Id.* at 7–8. Further, the district court concluded that Plaintiffs' alleged injuries are too speculative to satisfy Article III. *Id.* at 9–10.

## D.    Standard of Review

The Court reviews *de novo* the dismissal of a complaint for lack of standing. *See Freeman v. First Union Nat.*, 329 F.3d 1231, 1234 (11th Cir. 2003).

## SUMMARY OF ARGUMENT

The district court properly recognized that Plaintiffs had pleaded only generalized and speculative theories of harm. *See* Doc. 66 at 5–10. The Court should affirm for multiple reasons.

To start, Plaintiffs' alleged lost confidence in the electoral process is insufficiently concrete. This Court has been clear that purely psychic injuries based on disagreement with government conduct are too abstract under Article III. *See Ladies Mem'l Ass'n, Inc. v. City of Pensacola*, 34 F.4th 988, 993 (11th Cir. 2022)

17

("[P]urely psychic injuries, like disagreeing with government action, are not concrete, so they do not give rise to standing."). Plaintiffs have waived their argument that they are injured as a result of potential vote dilution, and they now assert only the Secretary's decision not to respond to Plaintiffs' letter and conduct voter list maintenance in their preferred way has injured their confidence. *See* Br.at 9. That is precisely the type of abstract injury this Court has found insufficiently concrete.

Further, this Court has already held that alleged injuries based on an interest in compliance with election laws are generalized grievances. *See Wood*, 981 F.3d at 1314. To satisfy the threshold standing requirement, a plaintiff must plead that they have suffered an injury in fact, i.e., "an invasion of a legally protected interest that is both concrete and particularized and actual or imminent, not conjectural or hypothetical." *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 996 (11th Cir. 2020) (quotation omitted). A particularized injury is one that "affect[s] the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (citation omitted). This Court has held, in the context of a generalized vote dilution claim, that an interest in the proper administration of elections is a generalized

18

grievance because it is a concern shared by all members of the public. *See Wood*, 981 F.3d at 1314–16.

Plaintiffs can point to nothing other than this type of generalized injury (to the extent it can even be called an injury). The amended complaint makes clear that Plaintiffs' alleged lost confidence is caused by their concerns that there are ineligible voters on Georgia's active voter list. *See* Doc. 45 at 16, 18. If concerns about vote dilution, as alleged in *Wood*, are insufficiently particularized as to constitute an injury-in-fact, Plaintiffs' alleged lost confidence in the electoral process based on the potential for vote dilution certainly would be as well.

Plaintiffs argue that their injury comes from their personal interactions with the Secretary, *see* Br. 13–15, but that argument goes nowhere. Plaintiffs' interactions with the Secretary add up to a disagreement with the way the Secretary conducts list maintenance and his decisions in how to respond to Plaintiffs' unsolicited analysis of unknown origin. But the "psychological consequence presumably produced by observation of conduct with which one disagrees" is insufficient to confer standing. *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982). That Plaintiffs "personally saw" what they believe to be "anomalies" in Georgia's

19

active voter list is similarly irrelevant. Br. at 13–14. Interest in a problem, no matter how longstanding or sincere, is not sufficient to satisfy Article III. *See Sierra Club v. Morton*, 405 U.S. 727, 739 (1972). Nor is the Secretary's defense of this litigation, *see* Br. at 14, a cognizable injury, *see, e.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 569 n.4 (1992).

Plaintiffs' alleged injury is also too speculative to satisfy Article III. A plaintiff requesting prospective relief must show that their future injuries are "certainly impending." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245–46 (11th Cir. 2020) (quoting *Clapper*, 568 U.S. at 401). When an injury depends on a "speculative chain of possibilities," it is not "certainly impending or ... fairly traceable." *Clapper,* 568 U.S. at 414. Plaintiffs' alleged lost confidence in the electoral process is based on a speculative chain of possibilities: (1) there are ineligible voters on the active voter list; (2) those individuals will not be removed through the Secretary's ongoing maintenance procedures; (3) those ineligible individuals will engage in voter fraud; and (4) that no safeguards in place will prevent them from doing so. Plaintiffs cannot show they have standing by claiming they have been injured by their fear of a hypothetical future harm. *See id.* at 414–16; *see also City of S. Miami,* 65 F.4th at 638.

20

## ARGUMENT

### I.    Plaintiffs lack Article III standing because they have not suffered an injury in fact.

Article III limits federal courts to the consideration of "Cases" and "Controversies." U.S. Const. Art. III, § 2, cl. 1. The standing doctrine "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan*, 504 U.S. at 560. To satisfy the standing inquiry, the plaintiff "must prove (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson*, 974 F.3d at 1245 (citing *Lujan*, 504 U.S. at 560–61).

The district court properly dismissed the amended complaint for lack of standing. Plaintiffs cannot establish that they have standing because they cannot show that they have the "first and foremost of standing's three elements": an injury in fact. *Spokeo*, 578 U.S. at 338 (alterations adopted and quotations omitted). An injury in fact is "an invasion of a legally protected interest that is both concrete and particularized and actual or imminent, not conjectural or hypothetical." *Trichell*, 964 F.3d at 996 (quotation omitted). "[A] grievance that amounts to nothing more than an abstract and generalized harm to a citizen's interest in the proper application of the law does not count as an 'injury in fact.'" *Carney v. Adams*, 592 U.S. 53, 58 (2020). A particularized injury is one

that "affect[s] the plaintiff in a personal and individual way." *Spokeo*, 578 U.S. at 339 (citation omitted).

Plaintiffs raise only one theory of injury on appeal: their alleged lost confidence in the integrity of the electoral process. That does not come close to being a cognizable injury. It is abstract, generalized (i.e., not specific to any plaintiff) and speculative (i.e., depends on a chain of events that may never even happen).

### A.   Plaintiffs' alleged "lost confidence" is too abstract to constitute a cognizable injury.

A concrete injury "must be 'de facto'"; that is, it must actually exist." *Spokeo*, 578 U.S. at 340. Such an injury must be "'real,' and not 'abstract.'" *Id.* Although concrete injuries are usually tangible, such as monetary loss or physical harm, intangible injuries can be concrete if they have "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021).[3]

Plaintiffs' alleged lost confidence in the electoral process is far too abstract for Article III standing. Plaintiffs allege that their

---

[3] The district court did not opine on the concreteness of Plaintiffs' claims but decided that the injuries were speculative, generalized grievances. *See* Doc. 66 at 5–10.

22

confidence in the electoral system has been injured "as a direct and proximate consequence of Georgia's failure to maintain accurate voter lists." Doc. 45 at 18. But the Supreme Court and this Court have "consistently held that purely psychic injuries arising from disagreement with government action—for instance, 'conscientious objection' and 'fear'—don't qualify." *Gardner*, 962 F.3d at 1341 (quoting *Diamond v. Charles*, 476 U.S. 54, 67 (1986)); *see also Valley Forge*, 454 U.S. at 485–86; *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 24 (1998); *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 619 (2007) (Scalia, J., concurring) (recognizing that a plaintiff who has suffered only a "psychic injury" in the form of "mental displeasure" lacks a concrete injury); *Ladies Mem'l Ass'n*, 34 F.4th at 992–93. Plaintiffs' lost confidence claim is precisely this type of abstract injury. Plaintiffs complain that the results of their analysis "shook their faith in the electoral process" and that the Secretary's list maintenance procedures "eroded what little confidence they had left[.]" Br. at 5. But Plaintiffs cannot identify any injury, other than general dismay, that they have suffered.

Plaintiffs make no attempt to identify a "close relationship" between their lost confidence claim and a traditional harm, such as reputational harm or disclosure of private information. *See*

23

*TransUnion*, 594 U.S. at 425. Unsurprisingly, Plaintiffs point to no decision from the Supreme Court, this Court, or any other court of appeals that recognizes such a relationship or identifies lost confidence as a concrete injury.

Instead, Plaintiffs point to a handful of out-of-circuit district court decisions that Plaintiffs claim recognize lost confidence as Article III injuries. *See* Br. at 12–13.[4] Two such cases do not involve lost confidence claims based on government action at all. *See Millis*, 720 F. Supp. 3d at 709 (not addressing lost confidence and finding vote dilution injuries too abstract); *Wohl*, 512 F. Supp. 3d at 515 (holding that recipients of threatening robocalls had standing to bring voter intimidation claims against callers). Of the remaining three, one did not analyze the concreteness of "lost confidence." *See Griswold*, 554 F. Supp. 3d at 1103–04. The last two have been criticized as unpersuasive or wrongly decided. *See, e.g.*, *Am. C.R. Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 803 & n.18 (W.D. Tex. 2015) (*King* was incorrectly decided);

---

[4] *See Wisconsin Voter All. v. Millis*, 720 F. Supp. 3d 703 (E.D. Wis. 2024); *Green v. Bell*, No. 3:21-CV-00493-RJC-DCK, 2023 WL 2572210 (W.D.N.C. Mar. 20, 2023); *Judicial Watch, Inc. v. Griswold*, 554 F. Supp. 3d 1091 (D. Colo. 2021); *Nat'l Coal. on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500 (S.D.N.Y. 2021); *Judicial Watch, Inc. v. King*, 993 F. Supp. 2d 919 (S.D. Ind. 2012).

*Republican Nat'l Committee v. Aguilar*, No. 2:24-CV-00518-CDS-MDC, 2024 WL 4529358, at \*5 (D. Nev. Oct. 18, 2024) (*King, Green,* and *Griswold* are unpersuasive); *Jud. Watch, Inc. v. Read,* No. 6:24-CV-01783-MC, 2025 WL 2242876, at \*6 (D. Or. Aug. 5, 2025) (*King* and *Griswold* are unpersuasive). Not that it really matters, but the large majority of district courts to have considered similar claims have found no standing, whether for lack of concreteness, particularity, or imminence. *Jud. Watch v. Ill. State Bd. of Elections,* No. 24-cv-1867, 2024 WL 4721512, at \*5 (N.D. Ill. Oct. 28, 2024).[5]

Finally, the importance of "protecting public confidence in elections" is irrelevant to an Article III standing analysis. Br. at 8, 12 (quoting *Ga. Muslim Voter Project v. Kemp,* 918 F.3d 1262,

---

[5] *See, e.g., Read,* 2025 WL 2242876, at \*6; *Mussi v. Fontes,* No. 24-cv-01310, 2024 WL 4988589, at \*7–8 (D. Ariz. Dec. 5, 2024) (collecting cases); *Republican Nat'l Comm. v. Benson,* 754 F. Supp. 3d 773, 786 (W.D. Mich. 2024); *Aguilar,* 2024 WL 4529358, at \*5; *Martinez-Rivera,* 166 F. Supp. 3d at 789; *Iowa Voter All. v. Black Hawk Cnty.,* 515 F. Supp. 3d 980, 991–92 (E.D. Iowa 2021); *Mancini v. Delaware County,* No. 24-cv-2425, 2024 WL 4680034, \*3 (E.D. Pa. Nov. 5, 2024); *Thielman v. Fagan,* No. 3:22-CV-01516-SB, 2023 WL 4267434 (D. Or. June 29, 2023), *aff'd sub nom. Thielman v. Griffin-Valade,* No. 23-35452, 2023 WL 8594389 (9th Cir. Dec. 12, 2023), *cert. denied,* 144 S. Ct. 2562 (2024); *Md. Election Integrity, LLC v. Md. State Bd. of Elections,* No. 24 C 672, 2024 WL 2053773, at \*3–4 (D. Md. May 8, 2024).

1274 (11th Cir. 2019)). The Supreme Court has expressly "reject[ed] th[e] notion" that "Art. III burdens diminish as the 'importance' of the claim on the merits increases … ." *Valley Forge*, 454 U.S. at 484. "The requirement of standing focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated." *Id.* (quotation omitted). Accordingly, the importance of public confidence in elections plays no role in analyzing whether Plaintiffs have standing to bring their claims.

### B. Lost confidence in the electoral process amounts to a generalized grievance.

Article III standing's injury in fact requirement "screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). For a plaintiff to access the federal courts, "the plaintiff cannot be a mere bystander, but instead must have a 'personal stake' in the dispute." *Id.* at 379 (quoting *TransUnion*, 594 U.S. at 423). The standing requirement "prevents the federal courts from becoming a vehicle for the vindication of the value interests of concerned bystanders." *Id.* at 382 (quotation omitted). "An injury to the right to require that the government be administered

26

according to the law is a generalized grievance." *Wood*, 981 F.3d at 1314 (quotation omitted). Such generalized grievances, "no matter how sincere," cannot satisfy Article III standing. *Id.* (quotation omitted).

As the district court recognized, Plaintiffs' claims depend on precisely this kind of generalized grievance. Doc. 66 at 7–8 (citing *Wood*, 981 F.3d at 1314–15). Whatever heightened level of subjective interest in the issue Plaintiffs claim to have, their heightened involvement does not give them any more of a real interest in the state's compliance with election laws than any other Georgia voter, or indeed any American. *See id.* at 7. And they do not explain how their concerns about alleged voter "anomalies" differ from anyone else's.

Plaintiffs erroneously argue that *Wood* is inapplicable to lost confidence claims because it addressed a vote dilution claim, making this a case of first impression. *See* Br. at 8. But Plaintiffs' confidence has allegedly been injured "as a direct and proximate consequence of Georgia's failure to maintain accurate voter lists." Doc. 45 at 18; *see also id.* at 6 ("Georgia's [i]naccurate [v]oter [r]olls [u]ndermine Plaintiffs' [c]onfidence in the [e]lection … ."); *id.* at 16 ("Georgia's improperly maintained voter rolls have undermined (and will continue to undermine) Plaintiffs'

27

confidence and trust in the electoral process … ."); Doc. 45-1 at 4 ("These illegitimate votes dilute the votes of the Aggrieved Persons and undermines their confidence in the state's elections … ."). In their own words, Plaintiffs' alleged lost confidence is a result of their fear that their votes *will be diluted* by illegitimate votes. If the generalized risk of vote dilution is not particularized, *a fortiori*, there can be no specific injury based merely on one's supposedly reduced *confidence* in the election caused by such a risk. To permit a plaintiff to simply recast a generalized vote dilution claim as a "lost confidence" claim would gut *Wood* entirely.

To be sure, *Wood* acknowledged certain classes of would-be plaintiffs who might be able to assert a particularized injury with respect to election integrity, such as a candidate challenging election irregularities or a poll monitor who was denied access to a recount area. *See Wood*, 981 F.3d at 1316. Plaintiffs are not among them. They are not candidates. They are not poll monitors who have been denied access to a recount. And *Wood* did not, as Plaintiffs claim, extend this hypothetical to any individual with a

28

"unique experience" or "interaction with the state different from that of the public." Br. at 11 & n.1.[6]

Further, it is irrelevant to the standing analysis that *Wood* addressed "state law," Br. at 11, and was "not based on a violation of the NVRA," *id.* at 8. A statutory private right of action does not mean that any plaintiff has automatically satisfied the injury-in-fact requirement. *See Spokeo*, 578 U.S. at 341. The relevant question in a standing analysis is whether Plaintiffs have suffered an injury, not which vehicle they intend to use to vindicate those rights.[7]

Plaintiffs do not meaningfully dispute that they lack standing to bring a lost confidence claim based on concerns about vote

---

[6] Plaintiffs claim that the Court held that poll monitors with "unique experiences of the recount events might have a particularized injury." Br. at 11 n.1. Not so. The Court hypothesized that a poll monitor who was denied access to the recount might have a particularized injury. *See Wood*, 981 F.3d at 1316. The potential particularized injury is the denial of access to the recount area, not the monitor's amorphous "experience."

[7] Plaintiffs have (wisely) waived any argument that they have suffered a particularized injury based on generalized vote dilution, *i.e.*, the risk of unlawful voting diluting Plaintiffs' votes. *See* Br. at 9. There is no reading of *Wood*, which explicitly rejects generalized vote dilution claims, that would allow for such a theory here.

29

dilution and voter list integrity.[8] Instead, in an effort to avoid *Wood*, Plaintiffs attempt to rewrite their amended complaint to argue that their confidence has been injured not by alleged inaccuracies in Georgia's voter rolls but by their "personal experiences" with the Secretary. *See* Br. 13–15. Plaintiffs identify five such "experiences": (1) Plaintiffs learned of active voters who allegedly requested mail forwards with USPS; (2) the Secretary did not respond to Plaintiffs' letter regarding their analysis; (3) the Secretary moved to dismiss this litigation; (4) Plaintiffs updated their analysis; and (5) the Secretary made arguments in his motion to dismiss that Plaintiffs found troubling. *See* Br. 14–15.

Plaintiffs' argument is unavailing and, at times, borderline nonsensical. Two of Plaintiffs" "experiences" with the Secretary—that Plaintiffs learned of active voters who allegedly requested mail forwards with USPS, and that Plaintiffs later updated this "analysis"—are not interactions with the Secretary. *See* Br. at 14. Nor do they demonstrate how Plaintiffs have any more stake in the outcome of their claims than any other person. As the district court recognized, it is insufficient that Plaintiffs have a personal

---

[8] In fact, Plaintiffs attempt to distinguish several district court cases on this basis. *See* Br. at 16–17.

interest in or knowledge of the integrity of Georgia's voter rolls. *See* Doc. 66 at 8. The Supreme Court has "consistently held that a plaintiff raising only a generally available grievance about government … and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." *Lujan,* 504 U.S. at 573–74. So too here. Plaintiffs have no more stake in the integrity of Georgia's elections than the public at large. *See All. for Hippocratic Med.,* 602 U.S. at 368 ("As Justice Scalia memorably said, Article III requires a plaintiff to first answer a basic question: 'What's it to you?'").

Plaintiffs' alleged "unique knowledge" does nothing to differentiate their stake in the outcome of their claims from their less informed peers. *See* Br. at 17–18. At the outset, it is unclear what unique knowledge Plaintiffs believe they possess. The amended complaint alleges that Plaintiffs used a publicly available list of registered voters obtained from the Secretary and publicly available change-of-address data. *See* Doc. 45 at 8. In any event, the district court properly recognized that special knowledge of the voter rolls does nothing to establish that Plaintiffs have suffered a particularized injury. Doc. 66 at 8.

Plaintiffs cite *Walters v. Fast AC, LLC*, 60 F.4th 642 (11th Cir. 2023), for the proposition that "personal knowledge" can form the basis of an injury in fact, Br. at 18, but they badly misread *Walters*. In that case, the Court held that deposition testimony based on the plaintiff's personal knowledge of his injuries was admissible under Federal Rule of Evidence 6.2 to prove standing and could be sufficient evidence of an injury at the summary judgment stage, without the need for additional "documentary" evidence of those injuries. *See Walters*, 60 F.4th at 648. The plaintiff testified as to his "lost time, economic harm, and emotional distress" injuries. *Id.* The Court did not hold or even suggest that particularized knowledge *itself* constitutes an Article III injury.

It is similarly irrelevant that Plaintiffs "personally saw" alleged anomalies in Georgia's active list. Br. at 13–14. That Plaintiffs took the time to examine public data regarding election registrations may show a sincere interest in election integrity, but that does not transform Plaintiffs' concerns into an injury in fact. Again, a "mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient" to satisfy Article III. *Morton*, 405 U.S. at 739.

32

Plaintiffs next argue, without any support, that the Secretary's decision not to respond directly to Plaintiffs' unsolicited letter and "analysis" constitutes some kind of cognizable injury. Br. at 14.  Plaintiffs cite no authority that compels a response from the Secretary in response to an unsolicited letter from members of the public, under the NVRA or otherwise. Nor can they explain how their alleged injuries as voters flow from the Secretary's lack of direct response to their letter. In *Wood*, the plaintiff's interest as a donor to the Republican party did not give him any more interest in the outcome of the election than other voter, and any alleged injuries did not flow from his donor status. *Wood*, 981 F.3d at 1316. So too here. Plaintiffs' "analysis" and decision to reach out to the Secretary do not give Plaintiffs any more stake in the maintenance of Georgia voter rolls than anyone else.

Moreover, concerns about voter roll integrity are in no way particular to Plaintiffs. In fact, as one district court recognized in analyzing a similar claim, it is a "consistent sentiment and is reflected as an issue in cases filed across the country." *Aguilar*, 2024 WL 4529358, at *5 (collecting cases). This only highlights the generalized nature of Plaintiffs' concerns about voter roll integrity.

The final two "experiences" that Plaintiffs point to only underscore the absurdity of their position. Plaintiffs claim that the Secretary's *motion to dismiss and the arguments he has made in litigation* have undermined their confidence in the electoral process.[9] *See id.* at 14–15. That is preposterous, and Plaintiffs cite no authority for the idea that *making legal arguments* can somehow constitute an injury in fact. "[A] plaintiff cannot retroactively create jurisdiction based on postcomplaint litigation conduct." *Lujan*, 504 U.S. at 569 n.4. These "experiences" are not relevant to the standing analysis.

In sum, if these five "experiences" were sufficient for standing, a would-be plaintiff could transform any generalized grievance regarding the administration of any law into a particularized injury simply by investigating the issue and attempting to contact a public official with their concerns prior to filing suit. That is nonsense, and the Court should affirm.

---

[9] Throughout this litigation, Plaintiffs have repeatedly claimed that the Secretary believes he does not have to conduct voter list maintenance at all. *See, e.g.*, Br, at 15; Doc. 45 at 19; Doc. 49 at 10. That is a misleading and insincere interpretation of the argument made in the Secretary's motion to dismiss, which argues that the Secretary has discretion as to whether to conduct list maintenance in response to an unsolicited, citizen-created "analysis." Doc. 30-1 at 14.

34

### C. Plaintiffs' alleged injury is too speculative to satisfy Article III.

"[W]hen plaintiffs seek prospective relief to prevent future injuries, they must prove that their threatened injuries are 'certainly impending.'" *Jacobson*, 974 F.3d at 1245–46 (quoting *Clapper*, 568 U.S. at 401). When an injury depends on a "speculative chain of possibilities," it is not "certainly impending or ... fairly traceable." *Clapper,* 568 U.S. at 414.

Plaintiffs' alleged lost confidence injury, even if it were cognizable and particularized (which it is not), is purely speculative. Their claimed injury rests on a speculative chain of possibilities, namely that (1) there are ineligible voters on the active voter list; (2) those individuals will not be removed through the Secretary's ongoing maintenance procedures; (3) those ineligible individuals will engage in voter fraud; and (4) that no safeguards in place will prevent them from doing so.

The Supreme Court has been clear that this sort of speculative fear of a chain of possibilities is insufficient to establish standing. In *Clapper*, for instance, a group of attorneys and related human rights organizations whose work required them to engaged in sensitive and confidential communications with individuals abroad challenged a provision of the Foreign Intelligence Surveillance Act of 1978 that allowed the Attorney

35

General and the Director of National Intelligence to gather surveillance on individuals are who not "United States persons" and are believed to be located outside the United States. *Id.* at 401. The plaintiffs alleged two injuries: (1) that their future communications would be intercepted, (2) that the provision caused them "present injuries ... stemming from a reasonable fear" of such unlawful interceptions. *Id.* at 407 (quotations omitted). In that case, the injuries were costs that the plaintiffs incurred due to those fears. The Supreme Court held that both were too speculative. The first relied on a "highly attenuated chain of possibilities." *Id.* at 410.  As to the second, the Supreme Court recognized that to recognize injuries inflicted by plaintiffs on themselves based on "fears of hypothetical future harm," "an enterprising plaintiff would be able to secure a lower standard for Article III standing simply by making an expenditure based on a nonparanoid fear." *Id.* at 416. The Supreme Court held that "allowing respondents to bring this action based on costs they incurred in response to a speculative threat would be tantamount to accepting a repackaged version of respondents' first failed theory of standing." *Id.*

As one district court recognized, the "the parallels between this case and *Clapper* are obvious." *Mussi*, 2024 WL 4988589, at

36

*8. Plaintiffs seek to repackage their vote dilution claim into a lost confidence claim predicated on fear of vote dilution. But the amended complaint reveals the speculative nature of the potential for vote dilution. *See, e.g.*, Doc. 45 at 1 ("Georgia's current voter rolls have thousands of voter registrations that are *apparently* incorrect." (emphasis added)), 9 ("This process identified many voters who *apparently* have moved out of the jurisdiction in which they are registered but are nonetheless included on Georgia's active voter lists[.]" (emphasis added)). Plaintiffs do not allege any facts about the likelihood of any ineligible voters attempting to vote or about any safeguards that might stop them. Plaintiffs' lost confidence based on fears of future vote dilution is precisely the type of fear based on speculation that *Clapper* foreclosed. *See also, e.g., City of S. Miami*, 65 F.4th at 638 (holding that injuries incurred because of a fear of hypothetical, future racial profiling was too speculative).

Plaintiffs contend that the district court erred in holding that their claims were too speculative because the district court failed to recognize that their alleged injury is "actual" rather than "imminent." Br. at 18–19. They suggest that only injuries pleaded as imminent injuries can be speculative, and those pleaded as actual injuries cannot. *See id.* Plaintiffs cite no authority for that

assertion. But more importantly, Plaintiffs argued before the district court that "a substantial risk that Plaintiffs' votes are being devalued vis-à-vis those of other voters … is yet another reason why [they] … have almost no confidence in Georgia's election process." Doc. 49 at 17. Plaintiffs' ever-evolving theory of injury is hardly the fault of the district court.

In any event, none of Plaintiffs' "experiences" with the Secretary that they contend caused "actual" injury to their confidence relate to their request for prospective injunctive relief. *See* Doc. 45 at 21. Plaintiffs request an injunction directing the Secretary to "investigate Plaintiffs' data" and direct county registrars to send notices to those individuals. *Id.* "Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate—as opposed to a merely conjectural or hypothetical—threat of future injury" *Church v. City of Huntsville*, 30 F.3d 1332, 1337 (11th Cir. 1994). Accordingly, this Court has "emphasized that to obtain prospective injunctive relief a plaintiff must show that he faces a substantial likelihood of injury in the future." *Wooden*, 247 F.3d at 1284. If, as Plaintiffs now claim, it is their interactions with the Secretary, and not the risk of future vote dilution, that has harmed them, Plaintiffs have failed to

38

plead that they are at risk of such future interactions with the Secretary. It is not certainly impending that the Secretary will decline to respond directly to future letters, and Plaintiffs have not pleaded any facts to suggest otherwise.

Plaintiffs' reliance on *Judicial Watch, Inc. v. Griswold* is misplaced. *See* Br. at 13. The *Griswold* decision determined that plaintiffs' lost confidence was an actual, not speculative injury based on an erroneous understanding of the Supreme Court's decision in *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008). *See Griswold*, 554 F. Supp. 3d at 1104. *Griswold* recognized an actual injury based on the "independent significance" that the Supreme Court has placed on "public confidence in the electoral process[.]" *Id.* (citing *Crawford*, 553 U.S. at 197). But the "independent significance" at issue in that case, which concerned voter identification requirements and did not address standing for individual plaintiffs, was the state of Illinois's interest in protecting public confidence in elections, which the Supreme Court held was distinct from the state's interest in preventing voter fraud. *See Crawford*, 553 U.S. at 197. *Crawford* does not address an *individual's* confidence in the electoral process at all, let alone provide support for the claim that an individual's lost confidence in the electoral process is an Article

39

III injury. This same misreading of *Crawford* also appears in

*King*, 993 F. Supp. 2d at 924, which Plaintiffs also cite. *See* Br. at

13.

## CONCLUSION

For the reasons set out above, this Court should affirm the

judgment of the district court.

Respectfully submitted.

/s/ *Alexandra M. Noonan*

Christopher M. Carr
  *Attorney General of Georgia*
Bryan Webb
  *Deputy Attorney General*
Elizabeth T. Young
  *Senior Ass't Attorney General*
Alexandra M. Noonan
  *Assistant Attorney General*
Office of the Georgia
  Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 793-5293
anoonan@law.ga.gov
*Counsel for Governor Kemp*
*and Secretary Raffensperger*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 8,260 words as counted by the word-processing system used to prepare the document.

/s/ *Alexandra M. Noonan*
Alexandra M. Noonan

## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2025, I served this brief by electronically filing it with this Court's ECF system, which constitutes service on all attorneys who have appeared in this case and are registered to use the ECF system.

/s/ *Alexandra M. Noonan*
Alexandra M. Noonan